**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION**

| | |
|---|---|
| CLOSET WORLD, INC, a Delaware Corporation<br><br>Plaintiff,<br><br>v.<br><br>STILES MACHINERY, INC. a Michigan Corporation<br><br>Defendant. | Case No. _____<br><br>Honorable _____<br><br>**COMPLAINT FOR**<br><br>**1)  BREACH OF WRITTEN CONTRACT**<br><br>**2)  BREACH OF EXPRESS WARRANTY**<br><br>**3)  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**<br><br>**4)  BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**<br><br>**5)  FRAUDULENT INDUCEMENT**<br><br>**6) NEGLIGENT MISREPRESENTATION**<br><br>**7) BREACH OF CONTRACT IMPLIED-IN-FACT**<br><br>**JURY TRIAL DEMANDED** |

**RHOADES MCKEE, PC**
Stephen Hulst, Esq. (P70257)
sjhulst@rhoadesmckee.com
55 Campau Avenue SW, Suite 300
Grand Rapids, MI 49503
Telephone: 616-235-2500
Facsimile:  616-233-5269

**CSREEDER, PC**
Christopher S. Reeder, Esq. (*admission pending*)
chris@csrlawyers.com
11766 Wilshire Blvd., Suite 1470
Los Angeles, CA 90025
Telephone: 310-861-2470
Facsimile: 310-861-2476

Attorneys for Plaintiff,
Closet World, Inc.

1
2
3
4

Plaintiff Closet World, Inc. ("Closet World") alleges the following based upon personal knowledge to itself and its own acts, and upon information, belief, and investigation.

5

**INTRODUCTION**

6
7
8
9
10
11
12
13
14

1.     Closet World is one of the largest custom closet and other home organization systems companies in the Country offering an array of custom closets, organization systems, home office, and garage storage solutions to customers in California and Nevada. After a custom solution is designed by Closet World and approved by the customer, from its manufacturing facility in City of Industry, California, Closet World manufactures the components of each custom system that is then installed in the home, office, or garage of the customer.  This requires an intricate manufacturing system as each cut of wood, wood color laminate, and component is specific to each custom system and must be timely manufactured and assembled in order to meet the customer's installation date.

15
16
17
18
19
20

2.     On July 13, 2018, Closet World and Defendant finalized an agreement, memorialized by two documents and two proposals, with Defendant Stiles Machinery, Inc. ("Defendant") for the purchase of what Defendant purported to be precision, state-of-the-art CNC[1] machinery, automation, and innovative software to create one integrated manufacturing system (hereinafter the "Agreement")).

21
22
23
24
25
26

3.     Leading up to the signing of the Agreement, Defendant assured Closet World that its products were ready for market in the United States and that it could fulfill Closet World's manufacturing needs by delivering a completely integrated manufacturing system.  Based on Defendant's representations, Closet World planned to replace its existing fleet of cutting machines— many of which had been acquired from Defendant—with the most modern technology available.

27

4.     In exchange for the millions of dollars that Closet World spent on Defendant's

28

---

[1] CNC is an acronym for computer numerical control.

automated system, Defendant delivered inferior products with makeshift engineering, more closely resembling generic equipment, machinery, and software purchased through a second-hand market, as it was written in Italian and German.  Remarkably, making matters worse, in persuading Closet World to buy the integrated automated system, Defendant touted the expertise of its support staff and promised they would make Closet World their "top priority" in the event of any technical difficulties with the equipment and software. However, as became apparent shortly after the purchase, the support staff proved to be a group of untrained personnel with no working knowledge of the "system."

5.     After twenty (20) months of technical breakdowns, delays, equipment malfunctions, missed delivery deadlines, and a myriad of other issues, it became apparent that Defendant induced Closet World to enter into the Agreement based on representations it knew to be false.  In fact, Defendant was (and is) incapable of fulfilling its obligations under its Agreement with Closet World and its warranties. Defendant accepted millions of dollars from Closet World in exchange for equipment and technology it knew or had reason to know was inoperable.

6.     Egregiously, after Closet World brought these issues to Defendant's attention, Defendant compounded Closet World's injuries by refusing to service other equipment Closet World acquired from Defendant, separate and apart from the inoperable system associated with the Agreement finalized by the Closet World and Defendant on July 13, 2018.

7.     As a result, Closet World has sustained a host of damages, including, without limitation, $3,145,658.27 in payments made to Defendant for equipment and machinery ($3,016,755.52), much of which has never been delivered, and "integrated" software ($128,902.75), which is only partially operable; $578,078 in incidental costs associated with advancing payments to Defendant and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software; and, at least $10,000,000.00 in consequential damages, flowing from

Defendant's failure to deliver working machinery, which has resulted in months of delays on existing orders, missed deadlines, waste of raw materials, undeliverable products to Closet World's customers, and the cost of hiring new employees solely to try and address issues presented by undisclosed issues with Defendant's equipment and software.  Closet World has separately incurred damages stemming from Defendant's refusal to service equipment it sold to Closet World (other than the inoperable equipment, machinery, and software at issue in the Agreement).

## **PARTIES**

8.     Plaintiff Closet World, Inc. ("Closet World") is a Delaware corporation with its principal place of business located at 3860 Capitol Ave., Whittier, California 90601-1733.

9.     Defendant Stiles Machinery, Inc. ("Defendant") is a Michigan corporation with its principal place of business located at 3965 44th St. SE, Grand Rapids, Michigan 49512.  Defendant does business across the United States and maintains regional locations in Bristol, Pennsylvania; Coppell, Texas; High Point, North Carolina; and, Rancho Cucamonga, California.[2]

## **JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The amount in controversy in this action exceeds $75,000, exclusive of interest and costs, and there is complete diversity as Closet World is a citizen of the states of Delaware and California, and Defendant is a citizen of the state of Michigan.

11.     This Court has personal jurisdiction over Defendant pursuant to *Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 US 915, 924, 131 S. Ct. 2846, 2852-2854 because Defendant is domiciled in the state of Michigan. Defendant is incorporated in the state of Michigan and maintains its principal place of business in Michigan.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendant

---

[2] https://www.stilesmachinery.com/contact (last accessed March 22, 2020)

resides in the County of Kent, Michigan. See 28 U.S.C. § 1391(c)(2). Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Closet World and Defendant entered into the Agreement, which forms a substantial basis for the events and omissions giving rise to the claims, in Kent County, Michigan and Los Angeles, California.  The documents comprising the Agreement are attached hereto as **Exhibits 1-4** respectively.

## FACTUAL ALLEGATIONS

13.    In 2016, Closet World began to research companies that could deliver top-of-the-line precision cutting machines and software in order to build a robust automated manufacturing system for its manufacturing facility located in the City of Industry, California.  Closet World sought to reduce the costs of production and streamline its design processes for its clients, so that Closet World could better scale its product lines of closet systems, garage systems, office systems, flooring, bed technology, and more.

14.    After researching various manufacturers of computer numerical control ("CNC") equipment, Closet World identified Defendant, Stiles Machinery, Inc. as a viable business partner, a company with which Closet World had previously done business.  At that time, Defendant advertised itself as one of the nation's largest suppliers of advanced automation, software and machinery, including CNC equipment for wood (and similar material) products. Defendant presented Closet World with demonstrations of their HOMAG ("HOMAG") brand of machinery and its "integrated" software system.  Defendant told Closet World that its software and automation system was ready for market in the United States, that it could be implemented without technical expertise, and that it could be readily deployed together with its HOMAG machines to create a fully automated line of production. Defendant claimed its HOMAG design software could be used to create all of the products in Closet World's product library catalog, which as noted above, included products relating to closet systems, garage systems, office systems, flooring, bed technology, and more.

15.     Closet World evaluated Defendant's product line of HOMAG equipment against its competitors. Closet World sent Defendant's sales personnel its product itinerary, price book, and several other jobs from its product line to recreate, and Defendant claimed to perform studies and material yield analysis of Closet World's line of products.

16.     In January 2017, Closet World rehired a former employee to review the results of various time studies and material yield analyses allegedly performed by Defendant.  Closet World introduced the employee to Defendant as the individual who would oversee the implementation of Defendant's machines and develop Closet World's library of products, in the event Closet World elected to purchase additional equipment, software, and automation from Defendant.  At that time, the employee had over eight (8) years of experience in the home organization industry and was thoroughly knowledgeable in all aspects of Closet World's production processes.  While Closet World introduced its employee to Defendant in order serve as a liaison for any technical issues that could arise in the future, at no point did Defendant inform Closet Word that the employee would be unable to administer Defendant's machinery and build out Closet World's product library catalog because he did not possess an engineering degree.

17.     In further discussions with Closet World, Defendant told Closet World that it would only take three to six months to create design data to input into Closet World's machines to create a fully automated manufacturing system.[3]  Defendant never revealed that its software program was written in Italian and that Closet World would need to deploy multiple software engineers and consultants of its own to decipher Defendant's software and integrate it with Defendant's hardware.

### Closet World's Acquisition of Automated Machinery and Equipment

18.     On or around June 14, 2018, Defendant transmitted an offer (identified as PA-1078H) to Closet World for the purchase of a "Stiles Machinery Package," consisting of 1) One (1) HOMAG

---

[3] This process was also referred to as building Closet World's "product library catalog."

Panel Management System, *Model STORETEQ 500 (Intellistore)* (also abbreviated herein as the "Panel Management System"); 2) One (1) HOMAG Panel Management System, *Model STORETEQ 500 with Fork Turner TTG 500 (Intellistore)* (also abbreviated herein as the "Panel Management System"); 3) One (1) HOMAG Free Standing Panel Labeling System, *Model HFE 200* (also abbreviated herein as "Panel Labeling System"); 4) One (1) HOMAG Panel Saw, *Model HPP 300-3800 US Edition* (also abbreviated herein as the "Panel Saw"); 5) Two (2) HOMAG Edgebanding Machine(s), *Model 2520 Serve 2 Coil AT* (also abbreviated herein as the "Edgebanding Machine(s)"); 6) Five (5) HOMAG CNC Router, *Model CENTATEQ N-700 (VANTAGE 200/510) with Nesting Concept 3R (L-to-R)* (also abbreviated herein as "CNC Router(s)"); 7) One (1) HOMAG CNC Router, *Model CENTATEQ N-700 (Vantage 200/510) with Nesting Concept 1R (L-to-R)* (also abbreviated herein as "CNC Router(s)"); 8) Two (2) HOMAG CNC Controlled Vertical Processing Center, *Model DRILLTEQ V-500 (BHX 200)* (also abbreviated herein as "CNC Center")); and, 9) Two (2) HOMAG Drill and Dowel Inserter, *Model DRILLTEQ D-200-Auto/12 (ABD 060)* (also abbreviated herein as the "Drill and Dowel Inserter"), for a special package price of $4,550,229.00. A copy of Proposal PA-1078H is attached as **Exhibit 1** to the Complaint.

19.     Upon receipt of a down payment, Defendant indicated it would deliver the Driller and Dowel Inserter within three (3) to four (4) months, the Panel Saw, Panel Management System, Panel Labeling System, the CNC Center, and Edgebanding Machine within six (6) months, and CNC Router within nine (9) months.  See page 5 to **Exh. 1**.

20.     Among the "Additional and Distinctive Benefits," included in Defendant's "Value Proposition," Defendant promised qualified field service; 24-hour service support with trained troubleshooting specialists; remote diagnostic capability; ample supply of spare parts; instructions for operating the equipment written in English; training and education; and, software and integration to drive production, with on-site implementation of machines and software.  See page 4 to **Exh. 1**.

21.     Defendant promised Closet World that one of its field representatives would "install" the equipment, which Defendant defined as the "assembly and preparation of the machines in the 'ready-to-run' state."  See page 6 to **Exh. 1**.

22.     Defendant further warranted that "once the machine is in the 'ready-to-run' state and necessary services have been provided, the field representative will test run, adjust as necessary, demonstrate, and instruct your personnel who are selected to operate this machine."

23.     Defendant assured Closet World that its needs were Defendant's "top priority," and, with the purchase of Defendant's equipment, Closet World would receive complimentary enhanced support services from Defendant, including 24-hour technical support for a period of two years.  See page 6 of **Exh. 1**.

24.     Furthermore, Defendant stated that it had the most significant parts and service commitment in the industry, which included "in excess of $40 million on hand part inventory available 24 hours a day/7 days a week/365 days a year."  See page 7 of **Exh. 1**.

25.     With respect to the Panel Management Systems, Defendant indicated that its machinery offered "increased productivity," "decreased dependency on manpower," "more consistent production meaning fewer production mistakes resulting in less waste and more profit," "less damage to parts during processing," and "Off-cut Management," among other benefits  (see pages 8 and 18 of **Exh. 1**). Defendant assured Closet World that "all literature, in the controls and documentation will come standard in the English language."  See pages 12 and 22 of **Exh. 1**.  Defendant also told Closet World that "Complete operation, integration, and programming training will occur at [Closet World]'s facility during and/or immediately following installation."  See pages 13 and 23 of **Exh. 1**. Notably, Defendant represented that the only prerequisite knowledge needed for running the machines was a "basic knowledge of Windows operation system."  See page 13 and 23 of **Exh. 1**.

26.     Regarding the Edgebanding Machine, Defendant claimed that the machine could

achieve "maximum productivity," (see page 39 of **Exh. 1**), with its "standardized control system," that allowed for "easy navigation for equal and intuitive operation of the machine" (see Exh. 49 of **Exh. 1**).

27.     Defendant made similar representations with respect to the CNC Routers, including claiming the operating manuals, spare parts descriptions, help texts in the integrated machine control, and operating system dialog would all be written in the English language.  See pages 62, 96 of **Exh. 1**.

28.     On July 11, 2018, Closet World and Defendant executed the first portion of its Agreement, with Closet World agreeing to purchase Defendant's PA-1078H equipment package at a purchase price of $4,550,229.00, as described in Proposal # PA-1078H.  Attached as **Exhibit 2** to the Complaint is a true and correct copy of the document memorializing the terms of the machinery portion of the Agreement, per the project description and proposal # PA-1078H, attached hereto as **Exhibit 1.**

29.     Defendant warranted in Section 9 of the terms and conditions of sale that "the goods sold hereunder shall be free from defects in materials and manufacture at the time of delivery to Buyer. Seller may, at its option, repair or replace any defect, or pay the reasonable cost thereof, for any such defects notice of which is given to Seller…"  Unfortunately, as described herein, Defendant failed to timely repair, replace, or pay for the cost of defective goods it sold to Closet World in Proposal # PA-1078H, despite Closet World's repeated notices to Defendant.

### *Closet World's Acquisition of "Integrated" Software*

30.     While Closet World and Defendant were discussing the machinery acquisition package (see **Exhibit 1**), on or around June 20, 2018, Defendant transmitted an offer, identified as Proposal SW-2307, to Closet World to purchase a Procollection Software Solution package, which included Defendant's Configurator3D, Designer3D, ControllerMES, and Cut Rite technology, for the

total purchase price of $309,561.00. A copy of Proposal SW-2307 is attached to the Complaint as **Exhibit 3**.

31.     Defendant created Proposal SW-2307 for Closet World based on "many meetings previously held between Closet World and Stiles / HOMAG during which the HOMAG ProCollection product range – Configurator3D, Designer3D and Controller MES – ha[d] been evaluated and detailed for realization of th[e] project." As stated by Defendant, its proposal was designed to present its "general planning for the realization of the project with the modules requested by Closet World."  See page 2 to **Exh. 3**.

32.     Defendant outlined the strategic project objectives related to the introduction of its software and stated that the proposal contained, "all needed software modules as well as services related to its implementation in your company based upon the current scope."  See Page 5 to **Exh. 3**.

33.     Defendant set forth various main stages of an integration project, which included a first phase for project planning and prototyping, a second phase for machine integration and manufacturing data, a third phase whereby Closet World's complete product catalog would be created, a fourth phase whereby Configurator3D would be "roll[ed]-out," and a fifth phase in which the Designer3D software would be "rolled-out."  See pages 6-7 to **Exh. 3**.

34.     Defendant promised to provide training, coaching, supervision, technical support, software installation and pre-configuration, on-site machine integration, and other services at each of the five phases to ensure the successful integration of its software with the equipment Defendant concurrently sold to Closet World.  See pages 19-24, 28 to **Exh. 3**.

35.     Defendant promised to support the catalog setup phase with training and coaching services.  See page 28 to **Exh. 3** at § 9.2.1.

36.     To ease any of Closet World's concerns, Defendant assured Closet World that Closet World's needs were Defendant's "top priority."  See page 30 to **Exh. 3**.

37.     On July 13, 2018, Closet World and Defendant fully executed a document memorializing the terms of Closet's World's acquisition of Defendant's ProCollection Software Solution (together with the machinery package), per Proposal SW-2307, for the purchase price of $309,561.00, less a $153,950.00 credit because of the machines Closet World concurrently acquired, for a total purchase price of $155.611.00. A copy of the executed sales document for the purchase of Defendant's ProCollection Software Solution, per Proposal SW-2307 (**Exhibit 3**), is attached to the Complaint at **Exhibit 4.**

38.     Defendant warranted in Section 9 of the terms and conditions of sale that "the goods sold hereunder shall be free from defects in materials and manufacture at the time of delivery to Buyer. Seller may, at its option, repair or replace any defect, or pay the reasonable cost thereof, for any such defects notice of which is given to Seller…" (See § 9, **Exh. 4.)** Unfortunately, as described below, Defendant failed to timely repair, replace, or pay for the cost of defective goods it sold to Closet World under the Agreement, despite Closet World's repeated notices to Defendant.

### *Defendant Delivers Defective and Nonconforming Goods*
### *and Fails to Perform under the Agreement*

39.     Based on numerous meetings and discussions between Closet World and Defendant and per their written Agreement, Closet World and Defendant planned to introduce the machinery, equipment, and software Closet World acquired to Closet World's manufacturing facility in phases, with the first pieces of physical equipment installed in February 2019. Defendant recommended to Closet World that it start building its product library catalog using its Configurator3D software (one of the software systems acquired in the Agreement) three (3) to four (4) months in advance of the introduction of the first machines.

40.     In abundance of caution, and to give itself additional time to prepare for the introduction of the new machines, Closet World began to build its product library catalog using

Defendant's software in August 2018.  However, Defendant did not provide Closet World with any training or instruction on how to build its product library catalog from Defendant's software. Nevertheless, Closet World attempted to decipher and administer the software.  Closet World's best efforts proved futile, when, between late September and early October 2018, Closet World learned that Defendant had written the programming foundation for the Configurator3D software in Italian. Copied below is an image of the Configurator3D software, as displayed in Italian and viewed by Closet World:



(Figure A)

41.     Without a working knowledge of Italian, Closet World, a U.S. company, could not develop the design and manufacturing data it needed to build its catalog prior to the introduction of the machines in February 2019, resulting in major delays to Closet World's production. On numerous occasions, Closet World asked Defendant to translate the Configurator3D software from Italian to English. Despite acknowledging the software should not have been written in Italian, Defendant was

unable to complete the translation in a timely manner, and, after months of going back and forth with Defendant, Closet World decided it would need to specifically hire a software engineer to troubleshoot the inherent flaws in Defendant's software and build designs for the library of products Closet World planned to manufacture on the new machines it agreed to acquire from Defendant.

42.     Unfortunately, by the end of January 2019, Closet World's product library catalog was nowhere near complete.  Defendant's representation that Closet World's product library catalog could be designed within 3-6 months proved to be false.

43.     In February 2019, Defendant delivered several of the machines itemized in the Agreement to Closet World's manufacturing facility in California.   However, at that time, Defendant's supporting software and automation system still was not operable or ready for production, and Closet World's product library catalog was not close to completion.  Without the benefit of a functional, integrated software system, Defendant's machines sat idle on Closet World's factory floors, consuming space and slowing down production. Had Closet World known that Defendant's software was not ready for integration with its machines, and that its product library catalog could not be built within the 3-6 month timeframe promised by Defendant, Closet World never would have allowed Defendant to deliver physical equipment to its production facility.

44.     Closet World was forced to delay the integration of Defendant's machines at its production facility until March 2019, and then again until April 2019 when recurring problems with Defendant's software arose.

45.     After Defendant finally delivered ControllerMES (another one of the software systems acquired by Closet World) in March 2019, albeit behind schedule, Closet World discovered that Defendant had written much of the ControllerMES software settings in German. Without a working knowledge of German, Closet World had limited ability to operate the software.  Despite Closet World's repeated requests to Defendant to change the language of ControllerMES to English, the

ControllerMES software Defendant delivered to Closet World remains written in German to this day.

46.     After Defendant installed three CNC Routers at Closet World's facility in April 2019, Closet World experienced major technical difficulties operating the machines, which included: i) parts not moving due to a lack of vacuum; ii) parts staggering on top of each other as they exited the machine feed; iii) printer malfunctions causing cut wood pieces to be produced without labels; iv) printer label stamping pad malfunctions, requiring the ordering of a replacement part (which was not installed until September 2019); v) wood sheets misdirecting into the infeed table, breaking the label printer; vi) moving outfeed tables, which had to be repeatedly reconnected to the router; vii) material improperly pushing out of the machines, resulting in recurring jams; viii) a malfunctioning pusher feature, resulting in multiple damaged parts; and, ix ) a broken vacuum housing.

47.     By May 2019, ControllerMES remained inoperable, and Closet World's product library catalog remained incomplete due to ongoing problems Closet World encountered with Defendant's equipment and software. As a result, Closet World could not resume testing of the CNC Routers until the end of June 2019, when the ControllerMES software finally became usable for production.  While Defendant and Closet World originally agreed that Defendant's engineers would be responsible for preparing production jobs printed from ControllerMES, Defendant was unable to create the reports in time to meet Closet World's production deadlines.  Consequently, Closet World created the reports itself and printed the jobs as they were created. This process defeated the entire purpose of Closet World investing millions of dollars in, what Defendant claimed to be, a fully integrated and automated manufacturing system ready for deployment in the United States market.

48.     On June 17, 2019, Defendant installed the Panel Saw (as sold to Closet World in the Agreement) at Closet World's production facility for purposes of handling all off-cuts of wood created by the CNC Routers during normal production.  However, after installing the equipment, Defendant informed Closet World that it failed to deliver the "off-cut" software with the machine.

Instead of replacing the machine, Defendant took an additional eight (8) months to fix the machine, causing Closet World to create large amounts of off-cut wood for months.  Closet World was forced to throw away the off-cut wood pieces, instead of using the excess raw material to manufacture other products.  Again, this defeated the purpose of acquiring the machine and "integrated" software in the first place.

49.     In July 2019, Defendant met with Closet World to assess the progress of integrating Defendant's software with the machines and equipment Closet World purchased.  In correspondence dated July 12, 2019, Defendant acknowledged an array of technical problems related to the integration of ControllerMES and Configurator3D software, which it had yet to remedy.  Defendant further acknowledged that the software programming should not have been written in Italian. Defendant claimed to need additional time to cure the issue, despite the fact that Closet World previously requested Defendant translate the operating language of the software several months prior, and despite Defendant's representations that all instructions for operating the equipment integrated with the software would come standard in English.

50.     On August 14, 2019, Defendant sent an application expert to visit Closet World's production facility to address ongoing problems with the equipment Closet World purchased from Defendant. With regard to the CNC Routers specifically, the "expert" made little to no progress fixing the mechanical defects.

51.     On September 9, 2019, Defendant sent a senior system installer from its east coast division to fix and repair the ongoing issues with the CNC Routers and to apply the recommendations made by the previous "expert".  The senior system installer remained at Closet World's production facility for two weeks attempting to fix the issues.  While the senior system installer remedied some of the router problems, the CNC Router equipment, to this day, is still incapable of cutting quarter inch wood material, which Closet World requires for several products in its library catalog and which

Defendant was aware of when it sold Closet World the equipment. See Proposal PA-1078H at pages 16, 26, **Exh. 1**.

52.     In the midst of Closet World's ongoing issues with the equipment and software it purchased from Defendant, Defendant routinely failed to communicate with Closet World or address its repeated calls for assistance. While Defendant assigned a project manager to Closet World to oversee the development and integration of the software together with the physical machinery and equipment, the same project manager never provided the technical MES requirements of Configurator3D to Closet World's primary catalog development engineer. This resulted in a three (3) to four (4) month delay in the integration of the ControllerMES software and Closet World's product library catalog development. The same project manager employed by Defendant routinely failed to communicate Closet World's ongoing difficulties with developing its product library catalog to his superiors, resulting in further delays.

53.     As another example, Defendant sold Closet World software for "monitoring machine performance" known as MMR. See pages 24-26 to Proposal SW-2307, **Exh. 3**. While Defendant presented MMR to Closet World as a tool to ensure precision in production, Defendant delivered no documentation to support its functionality, or any technical expertise or assistance to Closet World. After Closet World made numerous complaints, Defendant provided Closet World some documentation regarding how to operate the software, but did not provide any training whatsoever. As a result, Closet World has been unable to install the software on its user computers, and the software has proven useless to date.

54.     As of February 19, 2020, Closet World had twenty-three (23) outstanding action items requiring Defendant's attention. It is now clear that the ongoing problems with Defendant's machinery, equipment, software, and automation system will never be fully remedied. In fact, it appears that prior to contracting with Closet World, Defendant had never sold or installed the goods

purchased by Closet World, and that the goods were not ready for market use in the United States.

55.     Defendant's failure to deliver machinery, equipment, software, and an automation system free of defects has drastically impacted Closet World's production, resulting in months of delays, missed deadlines, broken and damaged equipment, excessive waste of raw materials, undeliverable products to Closet World's customers, and other wasted resources, including the cost of hiring new employees to operate Defendant's machines, who had no work to perform when Defendant failed to deliver working and operable equipment.  Defendant's refusal to service constant machine breakdowns continues to compound Closet World's losses.

*Defendant Refuses to Service Preexisting Machines*

*and Admits to Defects in its Machinery and Software*.

56.     Making matters worse, in or around March 2020, Defendant began refusing to service other machines Closet World acquired separate and apart from the Agreement, despite the fact that Defendant had previously rendered on-going technical services to Closet World and invoiced Closet World for performing such work, which Closet World has paid. Defendant's repudiation of its Agreement with Closet World to service other equipment Defendant previously sold to Closet World has only exacerbated Closet World's damages.

57.     Then, on April 21, 2020, Defendant transmitted a letter to Closet World purporting to terminate all "existing machinery orders," which necessarily included the Agreement.  Defendant justified terminating its Agreement based on Closet World's inability to schedule the delivery of additional equipment.  Notably, Closet World was unable to receive any further equipment from Defendant because Defendant failed to deliver an integrated system of software, equipment, and machinery that actually worked as Defendant promised.

58.     Remarkably, despite the fact that Closet World had already paid Defendant hundreds of thousands of dollars for equipment which Defendant never delivered, Defendant has refused to

refund Closet World its money and instead demanded an additional $293,277.58 from Closet World to pay for the costs of storing equipment Closet World never received and for defective equipment which did not work as Defendant promised.

59.     For instance, among the equipment for which Defendant has demanded further payment includes: 1) the Drill and Dowel Inserter, which has failed to drill according to Closet World's requisite specifications; 2) a CNC Router, with a malfunctioning spindle; 3) a Panel Management System, which has ceased to work properly; and 4) an Edgebanding Machine, which has stopped working. Closet World put Defendant's technical support team on notice regarding each of these issues on February 17, 2020, March 2, 2020, March 6, 2020, and April 3, 2020, respectively. To date, Defendant has refused to refund, repair, or replace the defective equipment.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### (Breach of  Written Contract)

60.     Closet World re-alleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

61.     In July 2018, Closet World and Defendant entered into an Agreement pursuant to the equipment and software sales documents dated July 9, 2018 and July 11, 2018, respectively, copies of which are attached as **Exhibits 1-4**, and made a part of this Complaint. Closet World agreed to the purchase and sale of automated wood (and similar material) cutting equipment and software designed for integration with Defendant's equipment cutting machines.  In consideration for obtaining the equipment identified in Proposal PA-1078H (see **Exh. 1** to Complaint) and the software identified in Proposal SW-2307 (see **Exh.** 3 to Complaint), Closet World agreed to pay a purchase price of $4,550,229.00 for the equipment and $155,611.00 for the software.

62.     To date, Closet World has paid Defendant $3,145,658.27 pursuant to the payment

installment terms of the Agreement, with $3,016,755.52 paid toward equipment and machinery and $128,902.75 paid toward "integrated" software, with the remaining balance to be paid upon the delivery and installation of further operable equipment and further use of the software and segment completion.  Closet World has performed, or has substantially performed, all the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement.  To the extent Closet World has not performed in full under the Agreement, Closet World's performance was excused by Defendant, including due to Defendant's failure to deliver and install the equipment promised under the Agreement in a ready-to-run state, together with fully operable software that could be integrated with the machinery and equipment.

63.     At the end of August 2018, Defendant delivered keys to access its Configurator3D software to Closet World to begin developing its product library catalog.  Between late September and early October 2018, Closet World notified Defendant that its Configurator3D software was written in Italian.

64.     Defendant subsequently breached the Agreement for the acquisition of Defendant's software by, among other things, delivering non-conforming goods and failing to timely repair, replace, or refund Closet World's payment for the Configurator3D software.

65.     In March 2019, Defendant delivered to Closet World the ControllerMES software specified in the Agreement (see **Exhs. 3** and **4** to Complaint).  After Closet World discovered that the ControllerMES software was written in German, Closet World requested Defendant translate the ControllerMES software into English.

66.     Defendant subsequently breached the Agreement for the acquisition of Defendant's software, by, among other things, delivering non-conforming goods and failing to timely repair, replace, or refund Closet World's payment for the ControllerMES software. Additionally, Defendant breached the Agreement for the acquisition of Defendant's software by failing to timely prepare

production reports printed from the ControllerMES software and failing to provide the technical MES requirements of the Configurator3D software to Closet World's primary catalog development engineer.

67.     Together with the Agreement, Defendant also agreed to deliver software for "monitoring machine performance" known as MMR.  See pages 24-26 to Proposal SW-2307, **Exh. 3**. Defendant breached the Agreement by failing to provide adequate documentation regarding how to operate the software and by failing to provide any training whatsoever.

68.     Further, as part of the Agreement, Defendant agreed to supply Closet World with licenses to operate its various software systems (see page 25 to **Exh. 3**.)  Defendant breached the Agreement by failing to provide Closet World with the licenses it promised to deliver in the Agreement.

69.     After Defendant delivered three CNC Routers to Closet World in April 2019 and finished installing them in May 2019, the machines began to malfunction, including by, but not limited to: i) parts not moving due to a lack of vacuum; ii) parts staggering on top of each other as they exited the machine feed; iii) printer malfunctions causing cut wood pieces to be produced without labels; iv) printer label stamping pad malfunctions, requiring the ordering of a replacement part (which was not installed until September 2019); v) wood sheets misdirecting into the infeed table, breaking the label printer; vi) moving outfeed tables, which had to be repeatedly reconnected to the router; vii) material improperly pushing out of the machines, resulting in recurring jams; viii) a malfunctioning pusher feature, resulting in multiple damaged parts; and, ix) a broken vacuum housing.

70.     After discovering the defects and specifically discussing them with Defendant in mid-June 2019, Closet World requested that Defendant perform its obligations under the contract by, among other things, timely repairing, replacing, or refunding Closet World's payment for the

acquisition of the machines.

71.     Defendant has breached the Agreement, by, among other things, delivering non-confirming goods and failing to timely repair, replace, or refund Closet World's payment for the three CNC Routers, which to this day continue to suffer from various defects, including the inability to cut quarter-inch wood material.

72.     On June 17, 2019, Defendant installed the Panel Saw at Closet World's production facility in California.  After Defendant installed the equipment, Defendant informed Closet World that it failed to deliver the "off-cut" software with the CNC Routers.

73.     Defendant breached the Agreement, by, among other things, delivering nonconforming goods and failing to timely repair, replace, or refund Closet World's payment for the acquisition of the Panel Saw and CNC Routers.

74.     Between April 2019 and June 2019, Defendant breached the Agreement by shipping and installing machines and equipment without delivering several of the purported "Additional & Distinctive Benefits Included" with its machinery package, including, but not limited to, operable "Software packages to drive productions," "Custom integration," and "On-site implementation of machines and software." See page 4 to **Exh. 1**.

75.     In addition, between February 17, 2020 to April 3, 2020, Closet World put Defendant on notice that the follow items of equipment delivered by Defendant ceased to work properly, if at all: 1) the HOMAG Drill and Dowel Inserter, *Model DRILLTEQ D-200-Auto/12 (ABD 060)* machine; 2) A HOMAG CNC Router, *Model CENTATEQ N-700 (VANTAGE 200/510) with Nesting Concept 3R (L-to-R)*; 3) A HOMAG Panel Management System, *Model STORETEQ 500 (Intellistore)*; and 4) a HOMAG Edgebanding Machine(s), *Model 2520 Serve 2 Coil AT*.

76.     Defendant breached the Agreement, by, among other things, delivering nonconforming goods and failing to timely repair, replace, or refund Closet World's payment for the

acquisition of the equipment specified above.

77.     As a result of Defendant's breaches of the Agreement, Closet World has suffered damages to date for the costs paid toward acquiring Defendant's machinery, equipment (much of which has never been delivered) in the amount of $3,016,755.52, and software in the amount of $128,902.75, plus i)  $578,078.00 in hard costs associated with preparing its manufacturing facility for the installation of Defendant's equipment and integrated software; and ii) amounts approximating or exceeding $10 million associated with production delays, lost revenues, and other monetary losses caused by Defendant.  In total, Closet World's damages stemming from Defendant's breach of its written contract with Closet World exceeds $13,723,736.27.

## SECOND CLAIM FOR RELIEF

### (Breach of Express Warranty)

78.     Closet World re-alleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

79.     In connection with Closet World's acquisition of Defendant's machinery, equipment, and "integrated" software, Defendant warranted, in writing, that the machinery, equipment, and "integrated" software, as described in Proposals PA-1078H and SW-2307, "shall be free from defects in materials and manufacture at the time of delivery to [Closet World]."   (See § 9, **Exh. 2**; § 9, **Exh. 4**.)

80.     Defendant further warranted that Closet World possessed a remedy for the "repair, replacement, or payment" for any defects in the materials delivered to Defendant, so long as Closet World provided Defendant sufficient notice, as defined by the Agreement. (See § 9, **Exh. 2**, § 9, **Exh. 4**.)

81.     Defendant's express promises and affirmations regarding the quality of its equipment, machinery, and "integrated" software became part of the basis for the bargain between Closet World

and Defendant and thus constituted an express warranty.

82.     Thereafter, Defendant breached the express warranty by delivering equipment, machinery, and software containing numerous manufacturing defects, including, but not limited to, the following instances:

a.  In August 2018, Defendant delivered Configurator3D software to Closet World, which was written in Italian.  Between late September 2018 to early October 2018, Closet World notified Defendant, in writing, that its Configurator3D software was written in Italian and requested that Defendant translate the software into English, consistent with Defendant's representations that all of the operating controls, documentation, and manuals related to the equipment with which the software was "integrated" would come standard in the English language. Closet World made ongoing, repeated requests to Defendant to translate the Configurator3D software into English, including through July 2019.  In response to Closet World's repeated requests, Defendant failed to timely perform the translation and otherwise timely repair, replace, or return Closet World's payments for the cost of the Configurator3D software.

b.  In March 2019, Defendant delivered its ControllerMES software to Closet World.  After the installation was completed in April 2019, Closet World discovered the software was written in German.  In April 2019, Closet World notified Defendant, orally and in writing, that Defendant's ControllerMES software was written in German and requested Defendant translate the ControllerMES software into English, consistent with Defendant's representations that all of the operating controls, documentation, and manuals related to the equipment with which the software was "integrated" would come

standard in the English language. Closet World continued to make ongoing, repeated requests to Defendant to translate the software into English, including through July 2019. In response to Closet World's repeated requests, Defendant failed to timely perform the translation and otherwise timely repair, replace, or return Closet World's payments for the cost of the Configurator3D software.

c.  Defendant failed to deliver integrated software technology in that the ControllerMES software and Configurator3D software were not capable of syncing with one another and integrating with the equipment Closet World acquired from Defendant.  Closet World notified Defendant in person of this defect in April 2019 and again, in person and in writing, on or around July 12, 2019. Despite acknowledging the defects with its software, Defendant failed to timely repair, replace, or return Closet World's payments for the cost of the ControllerMES and Configurator3D software, and the equipment, which the software was supposed to integrate to create an automated production line.

d.  Defendant delivered three malfunctioning CNC Routers, and failed to timely repair, replace, or return Closet World's payment for the equipment after Closet World discovered the breach of warranty at the end of May 2019 and put Defendant on notice of the defects in mid-June 2019, and in multiple, subsequent oral and written communications.

e.  Defendant delivered a Panel Saw on June 17, 2019 without the requisite "off-cut" software together with the machine with the CNC Routers, and failed to timely repair, replace, or return Closet World's payment for the Panel Saw after Closet World discovered the breach of warranty and put Defendant on notice of the defect in mid-July 2019, and in multiple subsequent oral and

written communications.

f. Defendant delivered equipment and machinery without operable, integrated software that could deliver a fully automated manufacturing system, and failed to timely repair, replace, or return Closet World's payment for the equipment and machinery after Closet World put Defendant on notice of its inability to use the machinery in mid-June 2019, continuing through July 2019, and in subsequent oral and written communications thereafter.

g. Defendant delivered 1) a Drill and Dowel Inserter, *Model DRILLTEQ D-200-Auto/12 (ABD 060)* which has failed to drill according to Closet World's requisite specifications; 2) A HOMAG CNC Router, *Model CENTATEQ N-700 (VANTAGE 200/510) with Nesting Concept 3R (L-to-R)* with a malfunctioning spindle; 3) a HOMAG Panel Management System, *Model STORETEQ 500 (Intellistore)* with a malfunctioning infeed; and 4) a HOMAG Edgebanding Machine(s), *Model 2520 Serve 2 Coil AT*, which has stopped working. Closet World emailed and put Defendant's technical support team on notice regarding each of these issues on February 17, 2020, March 2, 2020, March 6, 2020, and April 3, 2020, respectively. To date, Defendant has refused to refund, repair, or replace the defective equipment.

83. As a result of these breaches of Defendant's express warranty, Closet World did not receive the equipment, machinery, and software as warranted by Defendant.

84. To date, Defendant has failed to timely or adequately repair, replace, or pay for the costs of the defects contained in its equipment, machinery, and software as described in Proposals PA-1078H and SW-2307. As such, the essential purpose for which Defendant made the express warranty has failed.

85.     Defendant has admitted that its "system" of equipment, machinery, and software has not worked as warranted, including on April 21, 2020 when it purported to cancel all existing machinery orders (which included the Agreement) with Closet World due to Closet World's inability to receive any further defective equipment and machinery from Defendant.

86.     As a proximate result of this breach of warranty by Defendant, and the failure of the essential purpose of this warranty, Closet World has been left with unusable, at worst, and partially operable, at best, equipment, machinery, and software, representing a difference in value between amounts paid for the machinery and equipment, and software and their actual worth in the amount of $3,145,658.27.  Of the $3,145,658.27 Closet World has paid to Defendant to date pursuant to the Agreement, $919,822.02 has gone toward the acquisition of equipment that Defendant has never delivered to Closet World.

87.     Closet World has been further damaged as a result of Defendant's breaches of express warranty in the amount of i) $578,078.00 relating to incidental costs associated with advancing payments to Defendant consistent with the Agreement and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software; and ii) amounts approximating and exceeding $10 million associated with production delays, lost revenues, and other monetary losses caused by Defendant. In total, Closet World's incidental and consequential damages resulting from Defendant's breach of the express warranties contained in the Agreement exceeds $10,578,078.00.

**THIRD CLAIM FOR RELIEF**

**(Breach of Implied Warranty of Merchantability)**

88.     Closet World re-alleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

89.     In July 2018, Closet World and Defendant entered into an Agreement pursuant to the equipment and software sales documents dated July 9, 2018 and July 11, 2018, respectively, copies of

which are attached as **Exhibits 1-4** and made a part of this Complaint, for the purchase and sale of automated wood (and similar material) cutting equipment and software designed for integration with Defendant's equipment cutting machines.

90.     At the time of the sale, Defendant was a merchant and held itself out as a purported "industry leader" in the automated, wood (and similar material) cutting machinery and equipment industry, which included the production and distribution of integrated software

91.     However, Defendant breached a warranty implied in the Agreements for the sale of goods, by delivering cutting machinery, equipment, and a package of "integrated" software systems which did not run or operate within the variations permitted by the Agreement, of even kind, quality, and quantity within each unit of equipment and software program.

92.     As a result, Closet World did not receive goods as impliedly warranted by Defendant to be merchantable.

93.     With regard to the "integrated" software Closet World acquired, Closet World has, both in written email communications, oral conversations, and in in-person meetings put Defendant on notice of this breach, beginning in or around September 2018 and early October 2018 and continuing through the present time.

94.     With regard to machinery and equipment Closet World acquired, beginning in mid-June 2019 and continuing through the present time, Closet World has, both in written email communications, oral conversations, and in-person meetings, put Defendant on notice of this breach.

95.     Defendant has admitted that its "system" of equipment, machinery, and software has not worked as impliedly warranted, including on April 21, 2020 when it purported to cancel all existing machinery orders with Closet World due to Closet World's inability to receive any further defective equipment and machinery from Defendant.

96.     As a proximate result of this breach of warranty by Defendant, Closet World has been

left with unusable, at worst, and partially operational, at best, machinery, equipment, and software, representing a loss between the value paid for the machinery, equipment, and software and its actual worth in the amount of $3,145,658.27.  Of the $3,145,658.27 Closet World has paid to Defendant to date pursuant to the Agreement, $919,822.02 has gone toward the acquisition of equipment that Defendant has never delivered to Closet World.

97.     Closet World has been further damaged as a result of Defendant's breach in the amount of i) $578,078.00 relating to incidental costs associated with advancing payments to Defendant consistent with the Agreements and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software; and, ii) amounts exceeding $10 million associated with production delays, lost revenues, and other monetary losses caused by Defendant. In total, Closet World's incidental and consequential damages resulting from Defendant's breach equal $10,578,078.00.

## **FOURTH CLAIM FOR RELIEF**

### **(Breach of Implied Warranty of Fitness for a Particular Purpose)**

98.     Closet World re-alleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

99.     Leading up to June 2018, during various meetings and discussions between Closet and World and Defendant, Closet World informed Defendant that it desired to acquire a line of wood (and similar material) cutting equipment that could be integrated with computer software to create a fully automated manufacturing system for its catalog of closet systems, garage systems, office systems, flooring, bed technology, and more.  Closet World relied on Defendant's skill and judgment in presenting Closet World with suitable equipment and software for Closet World's stated purpose.

100.     In July 2018, Closet World and Defendant entered into an Agreement pursuant to the equipment and software sales documents dated July 9, 2018 and July 11, 2018, respectively, copies of

which are attached as **Exhibits 1-4** and made a part of this Complaint, for the purchase and sale of automated wood (and similar material) cutting equipment and software designed for integration with Defendant's equipment cutting machines.

101.  At the time of contracting for the sale of the cutting machinery, equipment, and software, Defendant had reason to know the particular purpose(s) for which the goods were required, by virtue of the many meetings held between Closet World and Defendant, in which Closet World expressly communicated the purpose of acquiring new cutting machinery, equipment, and software from Defendant.

102.  Closet World relied on Defendant's skill and judgment in furnishing suitable machinery, equipment, and software so that there was an implied warranty that the goods were fit for the particular purpose of acquiring a line of manufacturing equipment that could be integrated with computer software to create a fully automated manufacturing system for Closet World's catalog of closet systems, garage systems, office systems, flooring, bed technology, and more.

103.  However, Defendant breached the warranty implied at the time of sale in that Closet World did not receive suitable goods, and the goods were not fit for the particular purpose(s) for which they were required, in that the cutting machinery and equipment Defendant sold Closet World could not be integrated with the package of software programs Defendant concurrently sold to Closet World.

104.  Beginning in or around September 2018 and early October 2018 and continuing through the present time, Closet World has, in written email communications, oral conversations, and in-person meetings, put Defendant on notice of this breach in relation to the software Defendant sold to Closet World.

105.  Beginning in mid-June 2019 and continuing through the present time, Closet World has, in written email communications, oral conversations, and in-person meetings, put Defendant on

notice of this breach in relation to the equipment and machinery Defendant sold to Closet World.

106.   Defendant has admitted that its "system" of equipment, machinery, and software has not worked as impliedly warranted, including on April 21, 2020 when it purported to cancel all existing machinery orders with Closet World due to Closet World's inability to receive any further defective equipment and machinery from Defendant.

107.   As a proximate result of this breach of warranty by Defendant, Closet World has been left with unusable, at worst, and partially operational, at best, machinery, equipment, and software, representing a loss between the value paid for the machinery, equipment, and software and its actual worth in the amount of $3,145,658.27.  Of the $3,145,658.27 Closet World has paid to Defendant to date pursuant to the Agreement, $919,822.02 has gone toward the acquisition of equipment that Defendant has never delivered to Closet World.

108.   Closet World has been further damaged as a result of Defendant's breach in the amount of i) $578,078.00 relating to incidental costs associated with advancing payments to Defendant consistent with the Agreement and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software; and, ii) amounts exceeding $10 million associated with production delays, lost revenues, and other monetary losses caused by Defendant. In total, Closet World's incidental and consequential damages resulting from Defendant's breach equal $10,578,078.00.

**FIFTH CLAIM FOR RELIEF**

**(Fraudulent Inducement)**

109.   Closet World re-alleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

110.   Beginning in or around 2016, Defendant, acting through its agents and representatives, including Erik Delaney, Anatoli Nujic, Niklas Kogel, and Terry Palmer, began attempting to sell

Closet World on the prospect of contracting with Defendant to acquire a new line of wood (and similar material) cutting machinery and equipment that could be integrated with a package of software programs to create a fully automated manufacturing system in order for Closet World to more efficiently produce its catalog of closet systems, garage systems, office systems, flooring, bed technology, and more.

111.    In order to convince Closet World of the merits of buying new equipment and software from Defendant, Defendant, acting through its agents and representatives, Erik Delaney, Anatoli Nujic and Niklas Kogel, orally represented to Closet World, including through its Vice President of Operations, Alex Jivalagian, and others, at various times between 2017 and July 2018, that Defendant's machinery, automation and innovative software, as set forth in Proposals PA-1078H and SW-2307 (see **Exhs. 1** and **3** to Complaint) had been tested and implemented in the United States, and that they were fully ready for market in the United States.  Defendant, through Erik Delaney, Anatoli Nujic, Niklas Kogel, and Terry Palmer, informed Closet World, through Alex Jivalagian and others, at various times between 2017 and July 2018, that it had the technology and support staff necessary to deliver a completely integrated and automated manufacturing system of cutting machinery, equipment, and software.

112.    Based on Defendant's representations, Closet World planned to replace its existing fleet of cutting machines—including multiple machines previously purchased from Defendant—with the new technology Defendant presented to Closet World in Proposals PA-1078H and SW-2307.  See **Exhs. 1** and **3** to Complaint.  Thereafter, Closet World entered into an Agreement with Defendant through the equipment and software sales documents, dated July 9, 2018 and July 11, 2018, respectively.

113.    Defendant's representations regarding the testing that it had performed of its equipment and "integrated" software proved to be false, along with its representations that the

equipment and "integrated" software was marketable in the United States.  After Defendant delivered its design software to Closet World, Closet World soon discovered that Defendant had coded the underlying software settings in several different foreign languages, despite knowing that Closet World was an American company conducting its operations in English.  In response to multiple calls for assistance, Defendant confirmed its software did not come standard in the English language, delayed translating the underlying software into English, failed to timely respond to other technical issues raised by Closet World, and, on at least one occasion, conveyed to Closet World that its attempts to sync the ControllerMES software with the Configurator3D software had raised a "development issue[s]" which was  "under study for budget and time."

114.    In other words, Defendant's ongoing representations that its cutting-edge "integrated" software and equipment had been tested and was ready to be deployed for market in the United States and would be serviced by a highly trained technical staff available 24 hours a day / 7 days a week was false.

115.    In fact, upon information and belief, Defendant had yet to fully develop and test the "integrated" software and equipment it sold to Closet World, such that it could be deployed in an American production facility and managed by an American company with a basic knowledge of a Windows operating system and the English language, in order to create a fully automated manufacturing system. Moreover, upon information and belief Defendant never employed or contracted with trained technical staff that could respond to service calls 24 hours a day / 7 days week.

116.    At all times, Defendant's agents and employees who made the false statements set forth herein were acting within the course and scope of such agency and employment with Defendant and with the permission and consent of Defendant at the time the false representations were made.

117.    Closet World is informed and believes and thereon alleges upon that the statements

made by Defendant to induce Closet World to enter into the Agreement were known to be false, or were made recklessly without knowledge of their truth, by Defendant at the time the statements were made, and were made with the intention to deceive and defraud Closet World. Defendant did so in order to induce Closet World to act in reliance on Defendant's representations or with the expectation that Closet World would enter into the Agreement.

118.   Closet World, at the time Defendant made the false representations set forth herein, was ignorant of the falsity of Defendant's representations and believed them to be true.  Closet World's reliance on Defendant's false statements was reasonable, particularly in light of its prior history of dealing with Defendant and Defendant's familiarity with Closet World's product line and business operations.  In reliance on Defendant's representations, Closet World accepted Defendant's Proposals, PA-1078H and SW-2307 and entered into the Agreement.  See **Exhs. 1-4** to Complaint.

119.   As a proximate result of Defendant's conduct as alleged herein, Closet World has expended $3,145,658.27 toward the purchase of unusable, at worst, and partially operable, at best, machinery, equipment (much of which was never delivered to Closet World), and software. In addition, Closet World has expended $578,078 in incidental costs associated with advancing payments to Defendant, consistent with the Agreement, and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software.  Furthermore, Closet World has lost revenues caused by a substantial decline in its production capacity in amounts exceeding $10 million in damages, associated with production delays, lost revenues, and other monetary losses caused by Defendant.

120.   Defendant's aforementioned conduct constituted intentional misrepresentations, deceit and concealment of material facts known by Defendant to be false, or recklessly made without knowledge of their truth, with the intention of taking millions of dollars from Closet World. Defendant's conduct has subjected Closet World to cruel and unjust hardship in conscious disregard

of Closet World's rights, so as to justify an award of exemplary damages.

## SIXTH CLAIM FOR RELIEF

### (Negligent Misrepresentation)

121.     Closet World re-alleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

122.     Beginning in or around 2016, Defendant, acting through its agents and representatives, including Erik Delaney, Anatoli Nujic, Niklas Kogel, and Terry Palmer, began attempting to sell Closet World on the prospect of contracting with Defendant to acquire a new line of wood (and similar material) cutting machinery and equipment that could be integrated with a package of software programs to create a fully automated manufacturing system in order for Closet World to more efficiently produce its catalog of closet systems, garage systems, office systems, flooring, bed technology, and more.

123.     In order to convince Closet World of the merits of buying new equipment and software from Defendant, Defendant, acting through its agents and representatives, Erik Delaney, Anatoli Nujic and Niklas Kogel, orally represented to Closet World, including through its Vice President of Operations, Alex Jivalagian, and others, at various times between 2017 and July 2018, that Defendant's machinery, automation and innovative software, as set forth in Proposals PA-1078H and SW-2307 (see **Exhs. 1** and **3** to Complaint) had been tested and implemented in the United States, and that they were fully ready for market in the United States.  Defendant, through Erik Delaney, Anatoli Nujic, Niklas Kogel, and Terry Palmer, informed Closet World, through Alex Jivalagian and others, at various times between 2017 and July 2018, that it had the technology and support staff necessary to deliver a completely integrated and automated manufacturing system of cutting machinery, equipment, and software.

124.     Based on Defendant's representations, Closet World planned to replace its existing

fleet of cutting machines—including multiple machines previously purchased from Defendant—with the new technology Defendant presented to Closet World in Proposals PA-1078H and SW-2307.  See **Exhs. 1** and **3** to Complaint.  Thereafter, Closet World entered into an Agreement with Defendant through the equipment and software sales documents, dated July 9, 2018 and July 11, 2018, respectively.

125.    Defendant's representations regarding the testing that it had performed of its equipment and "integrated" software proved to be false, along with its representations the equipment and "integrated" software was marketable in the United States.  After Defendant delivered its design software to Closet World, Closet World soon discovered that Defendant had coded the underlying software settings in several different foreign languages, despite knowing that Closet World was an American company conducting its operations in English.  In response to multiple calls for assistance, Defendant confirmed its software did not come standard in the English language, delayed translating the underlying software into English, failed to timely respond to other technical issues raised by Closet World, and, on at least one occasion, conveyed to Closet World that its attempts to sync the ControllerMES software with the Configurator3D software had raised a "development issue[s]" which was  "under study for budget and time."

126.    In other words, Defendant's ongoing representations that its cutting-edge "integrated" software and equipment had been tested and was ready to be deployed for market in the United States and would be serviced by a highly trained technical staff available 24 hours a day / 7 days a week was false.

127.    In fact, upon information and belief, Defendant had yet to fully develop and test the "integrated" software and equipment it sold to Closet World, such that it could be deployed in an American production facility and managed by an American company with a basic knowledge of a Windows operating system and the English language, in order to create a fully automated

manufacturing system. Moreover, upon information and belief, Defendant never employed or contracted with trained technical staff that could respond to service calls 24 hours a day / 7 days week.

128. At all times, Defendant's agents and employees who made the false statements set forth herein were acting within the course and scope of such agency and employment with Defendant and with the permission and consent of Defendant at the time the false representations were made.

129. Closet World is informed and believes and thereon alleges upon information and belief that Defendant had no reasonable basis for believing the statements it made to Closet World to were true, and, that Defendant made these representations with the intention of inducing Closet World to act in reliance on Defendant's representations or with the expectation that Closet World would enter into the Agreement based on Defendant's representations.

130. Closet World, at the time Defendant made the false representations set forth herein, was ignorant of the falsity of Defendant's representations and believed them to be true. Closet World's reliance on Defendant's false statements was reasonable, particularly in light of its prior history of dealing with Defendant and Defendant's familiarity with Closet World's product line and business operations. Closet World's reliance on Defendant's representations was a substantial factor in agreeing to accept Defendant's Proposals, PA-1078H and SW-2307 and Closet World's entering into the Agreement. See **Exhs. 1-4** to Complaint.

131. As a proximate result of Defendant's conduct as alleged herein, Closet World has expended $3,145,658.27 toward the purchase of unusable, at worst, and partially operable, at best, machinery, equipment (much of which Defendant never delivered to Closet World), and software. In addition, Closet World has expended $578,078 in incidental costs associated with advancing payments to Defendant, consistent with the Agreement, and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software. Furthermore, Closet World has

lost revenues caused by a substantial decline in its production capacity in amounts approximating and exceeding $10 million in damages, associated with production delays, lost revenues, and other monetary losses caused by Defendant.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract Implied-in-Fact)

132.    Closet World re-alleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

133.    Prior to entering into the Agreement, Closet World utilized a line of industrial machinery and equipment in its manufacturing facility, which it acquired from Defendant.  Closet World used the previously acquired equipment from Defendant to cut the material it used to manufacture and assemble its line of customized walk-in closets, closet organization systems, and other storage solutions.

134.    Until March 2020, when Closet World notified Defendant of its legal claims with regard to the "integrated" software, machinery, and equipment Closet World acquired in the Agreement, Defendant had provided uninterrupted installation, repair, replacement and technical services to Closet World with regard to the preexisting fleet of industrial machinery and equipment Closet World acquired from Defendant.  In consideration for its installation, repair, replacement, and other technical services, Defendant engaged in a continuous pattern and course of dealing of invoicing Closet World for the services rendered, for which Closet World remitted payment.

135.    By virtue of the course of dealing between Defendant and Closet World, a contract, implied in fact was created between Defendant and Closet World in which Defendant provided installation, repair, replacement, and other technical services to Closet World so long as Closet World made monetary payments to Defendant for the reasonable value of its services.

136.    Defendant has since breached its contract with Closet World for the provision of

installation, repair, replacement, and other technical services relating to the fleet of industrial machinery and equipment Closet World acquired from Defendant, separate and apart from the Agreement, by refusing to provide repair, replacement, and technical services to Closet World, despite Closet World's continued performance under the agreement.

137. Defendant's breach of its agreement with Closet World could not come at a worse time. Prior to Defendant's breach, Closet World had been forced to continue to utilize the preexisting fleet of industrial machinery and equipment acquired from Defendant to power its production facility because of the various problems stemming from the "integrated" software, machinery, and equipment Defendant sold Closet World in July 2018. Following Defendant's breach, both the preexisting equipment Defendant sold Closet World and the new equipment Defendant sold to Closet World in July 2018 continue to suffer from operational glitches, defects, and errors which Defendant refuses to remedy.

138. As a result of Defendant's breach of its agreement to provide installation, repair, replacement, and other technical services to Closet World relating to the preexisting fleet of industrial machinery and equipment, Closet World has suffered a loss of production and revenues due to its inability to operate Defendant's machinery and equipment.

## **PRAYER FOR RELIEF**

**As to the First Causes of Action for Breach of Written Contract:**

1. For compensatory damages in the sum of $13,723,736.27, subject to proof;

2. For prejudgment interest at the statutory rate;

3. For costs of suit; and,

4. For such other and further relief as the court may deem proper.

**As to the Second Cause of Action for Breach of Express Warranty:**

1. For damages in the sum of $3,145,628.27

2.       For incidental and consequential damages in the sum of $10,578,078.00 subject to proof;

3.       For prejudgment interest at the statutory rate;

4.       For costs of suit herein incurred; and,

5.       For such other and further relief as the court may deem proper.

**As to the Third Cause of Action for Breach of Implied Warranty of Merchantability:**

1.       For damages in the sum of $3,145,658.27;

2.       For incidental and consequential damages in the sum of $10,578,078.00, subject to proof;

3.       For prejudgment interest at the statutory rate;

4.       For costs of suit herein incurred; and,

5.       For such other and further relief as the court may deem proper.

**As to the Fourth Cause of Action for Breach of Implied Warranty of Fitness for a Particular Purpose:**

1.       For damages in the sum of $3,145,658.27;

2.       For incidental and consequential damages in the sum of $10,578,078.00, subject to proof;

3.       For prejudgment interest at the statutory rate;

4.       For costs of suit herein incurred; and,

5.       For such other and further relief as the court may deem proper.

**As to the Fifth Cause of Action for Fraudulent Inducement:**

1.       For rescission of the Agreement;

2.       For damages, in the sum of i) $3,145,658.27, representing the amounts paid to Defendant to date under the Agreement; ii) $578,078.00, representing incidental costs

associated with advancing payments to Defendant consistent with the Agreement and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software; and, iii) $10 million in damages, subject to proof, representing Closet World's estimated lost revenues caused by the decline in its production capacity, associated with production delays, lost revenues, and other monetary losses caused by Defendant;

3.      For exemplary damages in amounts appropriate to compensate Closet World for the anguish, distress, and other complications caused by Defendant;

4.      For prejudgment interest at the statutory rate;

5.      For costs of suit incurred herein; and,

6.      For such other and further relief as the court may deem proper.

**As to the Sixth Cause of Action for Negligent Misrepresentation:**

1.      For damages, in the sum of i) $3,145,658.27, representing the amounts paid to Defendant to date under the Agreement; ii) $578,078.00, representing incidental costs associated with advancing payments to Defendant consistent with the Agreement and preparing its manufacturing facility for the installation of Defendant's equipment and "integrated" software; and, iii) $10 million in damages, subject to proof, representing Closet World's estimated lost revenues caused by the decline in its production capacity, associated with production delays, lost revenues, and other monetary losses caused by Defendant;

2.      For prejudgment interest at the statutory rate;

3.      For costs of suit incurred herein; and,

4.      For such other and further relief as the court may deem proper.

**As to the Seventh Cause of Action for Breach of Contract Implied-In-Fact:**

1.    For compensatory damages subject to proof;

2.    For prejudgment interest at the statutory rate;

3.    For costs of suit; and,

4.    For such other and further relief as the court may deem proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all claims asserted in this Complaint so triable.

DATED:  May 15, 2020                    Respectfully submitted,

**RHOADES MCKEE, PC**


By:/s/ *Stephen J. Hulst*
        Stephen J. Hulst (70257)


**CSREEDER, PC**


By:/s/ *Christopher S. Reeder*
        Christopher S. Reeder

**ATTORNEYS FOR PLAINTIFF, CLOSET WORLD, INC.**